774 F.2d 358
 Margaret A. WOLFENBARGER d/b/a Shady Sam's Pawn Shop,
Plaintiff-Appellant,
v.
Clancy WILLIAMS, Loy Bean, Robert L. Gillian, Dick Tannery,
Robert Perrine, the City of Lawton, Oklahoma, a
Municipal Corporation, Defendants-Appellees.
 No. 83-2331.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 26, 1985.
 
 Warren H. Crane, Lawton, Okl., for plaintiff-appellant.
 Gerald S. Rakes, Asst. City Atty., City of Lawton, Okl., for defendants-appellees Clancy Williams, Loy Bean, Robert Gillian and the City of Lawton, Okl.
 Michael C. Turpen, Atty. Gen., and Robert A. Nance, Asst. Atty. Gen., State of Okl., Oklahoma City, Okl., for defendant-appellee Robert Perrine.
 Before SEYMOUR, BREITENSTEIN, and SETH, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.
 
 
 2
 Margaret Wolfenbarger brought this action under 42 U.S.C. Sec. 1983 (1982) against the City of Lawton, City police officers Clancy Williams and Loy Bean, Chief of Police Robert Gillian, Comanche County District Attorney Dick Tannery, and Comanche County Assistant District Attorney Robert Perrine. Wolfenbarger, a licensed Oklahoma pawnbroker, alleges that defendants violated her constitutional right to due process when they seized certain property from her pawnshop and turned it over to a third party. The district court held that Wolfenbarger did not have a protected property interest in the items, and granted summary judgment in favor of defendants. We reverse.
 
 I.
 BACKGROUND
 
 3
 Wolfenbarger owns and operates Shady Sam's Pawn Shop in Lawton, Oklahoma. On August 15, 1980, Williams entered Shady Sam's while investigating a report of stolen property. The property, a stereo receiver and cassette player, had been reported as stolen[1] by the owner, a Mr. Logens, on August 13, 1980. In the course of his investigation of the pawnshop, Williams discovered that the serial numbers listed on two pawn tickets matched the numbers of the stolen stereo equipment. Williams did not confiscate the two items at that time but instead issued the pawnshop a ticket, placing the property on "hold". A "hold" was an official police request that a pawnshop not sell or otherwise dispose of items needed as evidence in a criminal investigation or prosecution. This was the Lawton police department practice in effect when Williams first discovered the property in Shady Sam's.
 
 
 4
 On October 30, 1980, District Attorney Tannery wrote a letter to Chief Gillian informing him of a change in the procedure Lawton police were to follow when they discovered suspected stolen property in pawnshops. The letter stated:
 
 
 5
 "Dear Chief Gillian:
 
 
 6
 After reviewing the applicable law, I would advise the use of the procedure used by Oklahoma and Tulsa Counties regarding stolen property recovered in pawn shops, to-wit:
 
 
 7
 1. Under the authority of 21 OS Sec. 1092 the officer and or true owner of merchandise should inspect the pawn shops for the stolen merchandise.
 
 
 8
 2. All stolen property found should be treated as if recovered from other parties. That means that the officers should seize the property and place it on property receipt in the custody of the police department.
 
 
 9
 3. Under 22 OS Sec. 1321 et seq. the magistrate will determine the disposition of the property.
 
 
 10
 Sincerely,
 
 
 11
 /s/ Dick Tannery
 
 
 12
 District Attorney"
 
 Rec., vol. I, at 89.[2]
 
 13
 Okla.Stat. tit. 21 Sec. 1092 (1981) requires a pawnbroker to permit a police officer to inspect the premises for stolen goods during usual business hours.[3] Okla.Stat. tit. 22 Secs. 1321 et seq. (1981) provides procedures to be followed when a police officer comes into possession of property allegedly stolen. Sections 1321 and 1322 provide that a magistrate must determine the true owner of any such property before the police may release it from their custody.[4] Coleman v. Faulkner, 697 F.2d 1347, 1348 (10th Cir.1982).
 
 
 14
 Gillian promulgated Tannery's letter to all members of the Lawton police department. On November 10, Williams and Bean returned to Shady Sam's and seized the two items Williams had previously identified and placed on hold. After giving Wolfenbarger a receipt for the items, Williams placed them in the Lawton police station property vault. Acting on District Attorney Tannery's behalf, Perrine sent a memorandum on November 13 to Williams directing him to release the two items to Logens. Williams complied the next day and gave the items to Logens.[5] Wolfenbarger was not notified of the property's release nor was there any judicial determination of the property's ownership before Perrine ordered it released.
 
 
 15
 Immediately after Williams seized the two items, Wolfenbarger brought a replevin action against him in state court. After Williams gave the items to Logens, the court declared the replevin action moot because Williams no longer had possession. Thereafter, Wolfenbarger brought this action in federal court alleging that defendants' conduct had deprived her of her right to due process under the United States Constitution. The district court held that Wolfenbarger, as a holder of stolen goods, had no constitutionally protected property right in the items and thus could not claim a due process violation. The court granted summary judgment in favor of defendants.
 
 II.
 PROPERTY INTEREST
 
 16
 In evaluating Wolfenbarger's due process claim we look to Oklahoma law to determine the nature and extent, if any, of her property interest in the stereo items.[6] See Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A pawnbroker, as the pledgee of pledged property, does not hold title to the property under Oklahoma law. Miller v. Horton, 69 Okl. 147, 170 P. 509, 511 (1917). Legal title remains in the pledgor and possession only passes to the pawnbroker, who has a special property interest in the item pledged until the obligation secured by the pledged property is satisfied. Id. The district court concluded, and defendants argue on appeal, that because Wolfenbarger had no title to the stereo items and could not prevail in a suit against the true owner, she therefore had no constitutionally protected property rights. We disagree.
 
 
 17
 It is true that under Oklahoma law, no one can confer a better title than he has. Wolfe v. Faulkner, 628 P.2d 700, 702 (Okla.1981); Al's Auto Sales v. Moskowtiz, 203 Okl. 611, 224 P.2d 588, 591 (1950); see also Okla.Stat. tit. 12A, Sec. 2-403(1) (1981) (buyer of goods cannot acquire greater title than seller). Since the true owner of the property cannot be divested of his ownership by a thief without his consent, even an honest pawnbroker cannot hold stolen property as against the true owner. Adkisson v. Waitman, 202 Okl. 309, 213 P.2d 465, 466 (1949). However, Wolfenbarger's lack of title is irrelevant to the existence of her rights in the property as against defendants. Under Oklahoma law, one who possesses property without having title to it nonetheless has a recognized property interest.
 
 
 18
 First, a pawnbroker's special property interest will support an action for replevin. See Williams v. Williams, 274 P.2d 359, 362 (Okla.1954); cf. Riesinger's Jewelers, Inc. v. Roberson, 582 P.2d 409, 411 (Okla.App.1978). In such an action the question of ownership and the right to possession is for the trier of fact. Henderson v. Lacy, 347 P.2d 1020, 1021 (Okla.1959). In addition, possession is prima facie proof of ownership. Al's Auto Sales, 224 P.2d at 591. Because there had been no judicial determination of either the property's ownership or the right to possess it, Wolfenbarger's possession was prima facie proof that she was entitled to retain the stereo equipment at the time defendants confiscated and turned it over to Logens.
 
 
 19
 More importantly, the Oklahoma Supreme Court has held that even one who acquires stolen property from a thief has a lawful and enforceable property interest in such property. In Snethen v. Oklahoma State Union of the Farmers Educational & Cooperative Union, 664 P.2d 377 (Okla.1983), the court was faced with deciding the property rights of a good-faith purchaser of stolen property. While acknowledging that a purchaser under defective title could not hold against the true owner, the court noted that the purchaser has a "qualified possessory interest" and has "lawful possession against all the rest of the world." Id. at 381. The court distinguished between "legal" and "lawful" property interests, and stated:
 
 
 20
 "A legal interest is enforceable against the whole world. A good-faith purchaser for value acquires an interest that is lawful and enforceable against all the world but the legal owner. Although it is only a qualified possessory interest, it is lawful and enforceable to a very large extent."
 
 
 21
 Id. (emphasis added).
 
 
 22
 Although the ultimate issue in Snethen was whether one could have an insurable interest in stolen property, its reasoning and holding also apply to this case and refute the argument that Wolfenbarger had no legally protected property interest in the stereo equipment. The record does not indicate, nor do defendants allege, that Wolfenbarger was anything but an innocent pawnbroker who gave value for a pledge of stolen property. Like a good-faith purchaser for value, an innocent pledgee's lack of title does not defeat the lawfulness of her possession, nor does it diminish her rights against the rest of the world, including defendants in this case.
 
 
 23
 Finally, the relevant Oklahoma statute itself demonstrates that the holder of stolen property has some protected interest, because the state has provided for a judicial determination of ownership or possession prior to the return or release of seized property. See Okla.Stat. tit. 22 Secs. 1321, 1322. It is defendants' bypassing of this required procedure that Wolfenbarger claims offends due process.
 
 
 24
 The district court reasoned that it did "not interpret section 1983 or the Constitution to permit the recovery of damages for seized property to a person whose right therein is in derogation of the rights of the true owner." Rec., vol. I, at 99. This conclusion erroneously assumes that the existence of a property interest depends only on one's ability to recover damages for the actual value of the items seized.
 
 
 25
 Wolfenbarger does not claim that her right to own the property was violated but rather, that her right to due process was violated. Although she may not recover the actual value of the items once she assumed the business risk of erroneously dealing with a thief, she may recover other damages for the violation of her right to due process. She may be entitled to nominal damages, see Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978), punitive damages against some of the defendants, see Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Lavicky v. Burnett, 758 F.2d 468, 477 (10th Cir.1985), or injunctive or declaratory relief. The fact that she does not have all the remedies available to a true owner with legal title is therefore irrelevant to the threshold issue of whether she has some constitutionally protected property interest.
 
 
 26
 Accordingly, we hold that Wolfenbarger had a constitutionally protected property interest in the stereo items sufficient to support a claim of violation of due process. The district court erred in holding to the contrary.
 
 III.
 DUE PROCESS
 
 27
 Defendants claim that even if Wolfenbarger had a protected property interest, their actions did not violate due process because Oklahoma provides adequate post-deprivation remedies. They rely on the Supreme Court's decisions in Hudson v. Palmer, --- U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). For the reasons set forth below, we believe neither of these decisions supports the grant of summary judgment in this case.[7]
 
 
 28
 In Parratt, a state prisoner sued prison officials under section 1983 alleging that their negligent loss of a hobby kit violated his right to due process under the Fourteenth Amendment. The Supreme Court held that no due process violation occurs when a state employee negligently deprives an individual of property, so long as the state provides an adequate post-deprivation remedy. The Court recognized that
 
 
 29
 "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking ... satisf[ies] the requirements of procedural due process."
 
 
 30
 Parratt, 451 U.S. at 539, 101 S.Ct. at 1915. The Court noted that where a loss of property is caused by the random, unauthorized act of a state employee, the state cannot predict when the loss will occur. Id. at 541, 101 S.Ct. at 1916. As the Court observed,
 
 
 31
 "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation."
 
 
 32
 Id.
 
 
 33
 In Hudson, the Court reaffirmed and extended the reasoning of Parratt to an unauthorized and intentional deprivation of property by a state employee. See 104 S.Ct. at 3203-04. In holding that such a deprivation does not violate due process, the Court explained:
 
 
 34
 "The underlying rationale of Parratt is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur. We can discern no logical distinction between negligent and intentional deprivations of property insofar as the 'practicability' of affording predeprivation process is concerned. The State can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct."
 
 
 35
 Id. at 3203. In rejecting the contention that one who intentionally deprives another of property can provide predeprivation process and therefore must do so, the Court in Hudson emphasized that "[t]he controlling inquiry is solely whether the State is in a position to provide for predeprivation process." Id. at 3204. In this connection, the Fifth Circuit recently noted:
 
 
 36
 "Parratt posits a distinction between (1) the random and unauthorized (and hence unpredictable) conduct of a state actor, and (2) conduct that the state can contain and direct by institutional safeguards. If the state cannot protect the individual by imposing predeprivation procedures, or if quick action is essential, the best the state can do is to allow injured individuals to recover damages after the injury has occurred."
 
 
 37
 Augustine v. Doe, 740 F.2d 322, 327 (5th Cir.1984) (citations omitted).
 
 
 38
 The situation in this case differs significantly from that in Parratt or Hudson. To begin with, not only is the state in a position to provide predeprivation process, it has expressly done so through the enactment of sections 1321 and 1322. Oklahoma has recognized that far from being impracticable or impossible, a hearing after the police initially take possession of property and before they release it is the most timely and efficient point at which to adjudicate property interests. Cf. Coleman v. Turpen, 697 F.2d 1341, 1344 (10th Cir.1983). The state recognizes this point as the time at which the harm to an individual can best be minimized while also accommodating the state's interest in restricting the movement of allegedly stolen property.
 
 
 39
 Once the police have confiscated and secured allegedly stolen property, the "necessity for quick action by the State," Parratt, 457 U.S. at 539, 101 S.Ct. at 1915, is no longer present. Defendants do not suggest, nor can we discern, any justification for an accelerated or immediate return of such property to one claiming ownership. The existence of sections 1321 and 1322 belie any suggestion that the state has or recognizes any need for such swift or expedited action, once the police have secured the property. Thus, one of the fundamental rationales of Hudson and Parratt, the need for quick action, is absent from this case. See Augustine, 740 F.2d at 327.
 
 
 40
 The record developed prior to the summary judgment motion indicates that the additional critical elements of random and unauthorized state conduct are not present here. In Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), the Court held that Parratt does not apply, and that post deprivation remedies do not satisfy due process, where a deprivation of property is caused by conduct pursuant to established state procedure. See id. at 435-37, 102 S.Ct. at 1157-59; see also Hudson, 104 S.Ct. at 3204. This distinction between random, unauthorized conduct and conduct pursuant to established state procedure is significant. See, e.g., Augustine, 740 F.2d at 327-29. As the Court noted in Logan, once the state has conferred a property interest, it may not authorize the deprivation of such an interest without procedural safeguards that comport with the standards of federal due process. See 455 U.S. at 432, 102 S.Ct. at 1155.
 
 
 41
 In Patterson v. Coughlin, 761 F.2d 886 (2d Cir.1985), the Second Circuit recognized that "established state procedure" involves more than the mere promulgation of procedures. There the court addressed an argument that Parratt and Hudson required dismissal of a section 1983 action against prison officials who, contrary to state law, refused to accord petitioner due process before ordering him to disciplinary confinement with loss of good time credits. The district court had dismissed the claim, stating: "Because the procedures existed, but were allegedly not followed, no meaningful predeprivation hearing was possible." Id. at 889-90. The appellate court rejected this contention.
 
 
 42
 "Allegations of procedural due process violations by certain individual government employees, as opposed to direct challenges to state procedures or the lack thereof, have long been accepted as constituting state action and forming the basis for a claim under the civil rights statutes. See, e.g., Monroe [v. Pape ], supra, 365 U.S. at 172 [81 S.Ct. 473, at 476, 5 L.Ed.2d 492]; Home Tel. & Tel. Co. [v. City of Los Angeles ], supra, 227 U.S. at 278, 282-85 [33 S.Ct. at 312, 313-14, 57 L.Ed. 510]; Mansell v. Saunders, 372 F.2d 573, 576 (5th Cir.1967). The requirements of the due process clauses are directed specifically to the federal and state governments. They require the promulgation of laws and regulations providing for regular procedures which the government must follow before it may deprive an individual of life, liberty or property. The execution of those laws and regulations also must conform to due process; otherwise the due process clause, with its guarantees of regular and predictable procedures, becomes a cipher. It is beyond cavil that due process requires more than the mere promulgation of laws and regulations which, if followed, would preserve the most fundamental of rights."
 
 
 43
 Id. at 891 (footnote omitted) (emphasis added). The court concluded:
 
 
 44
 "Unlike the deprivation of property that occurred in Parratt, here the responsible state officials who had the power to grant appellant a hearing obviously knew that appellant was in peril of being deprived of his liberty interest.... Thus, the deprivation of liberty was neither 'random' nor 'unauthorized.'
 
 
 45
 Id. at 892 (emphasis added).
 
 
 46
 In Lavicky v. Burnett, 758 F.2d 468 (10th Cir.1985), we recently considered a similar situation. In that case, Oklahoma sheriffs and deputy sheriffs seized a larceny defendant's pickup truck for use as evidence at the defendant's trial. Although the defendant was convicted, no part of the truck was introduced as evidence at trial and the defendant's attorney subsequently requested the truck's return from the prosecuting assistant district attorney. The prosecutor refused to return the truck until a third party had been allowed to remove a number of the truck's parts which he claimed the defendant had stolen from him. The prosecutor directed the sheriffs to turn over the parts, even though there had been no hearing as required by Okla.Stat.Ann. tit. 22, Secs. 1321, 1322. We held that the sheriffs and prosecutor had violated the defendant's procedural due process rights and that Parratt and Hudson did not bar his claim. We reasoned that "[t]hese actions constitute an intentional deprivation that may not be characterized as random.... This action, planned and authorized, is not the sort of action for which postdeprivation process will suffice." Lavicky, 758 F.2d at 473 (citing Logan, 455 U.S. at 436-37, 102 S.Ct. at 1158-59). See also Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir.1985) (county liable where jail personnel established unconstitutional jail customs contrary to written policy); cf. Gregory v. Town of Pittsfield, --- U.S. ----, ----, 105 S.Ct. 1380, 1382, 84 L.Ed.2d 399 (1985) (O'Conner, J., with whom Brennan, J., and Marshall, J., join dissenting from denial of certiorari) (questioning whether Parratt suggests that so long as state makes remedy available, contrary municipal policy comports with constitution).
 
 
 47
 We believe the reasoning and holding of Lavicky apply to this case. The record developed thus far indicates that the seizure and subsequent disposition of the stereo equipment were planned and authorized. District Attorney Tannery's letter to Chief Gillian reflects a conscious decision to alter the department-wide policy concerning allegedly stolen property and it is undisputed that Williams, Bean, and Gillian acted in direct response to this policy and the orders initiated by Tannery. Ten days after Tannery's letter to Gillian, Williams and Bean seized the stereo equipment, relying on this directive. It is also undisputed that Williams returned the property to Logens only after direct written authorization from Assistant District Attorney Perrine, acting on Tannery's behalf. In fact, the record indicates that on another occasion defendants followed an almost identical course of conduct with other property belonging to Wolfenbarger.
 
 
 48
 The conduct of which Wolfenbarger complains is the direct result of a directive issued by the district attorney, who under Oklahoma law shares with the county sheriff responsibility for law enforcement in the county. See Okla.Stat. tit. 19 Sec. 215.5 (1981); Op.Okla. Att'y Gen. No. 79-98 (1979). As a result of his position as an enforcement executive, law enforcement agents are guided by the district attorney's interpretations and policies. His decisions thus take on a force and effect that can lead to widespread abuse of official power. As we recently noted in Hewitt v. City of Truth or Consequences, 758 F.2d 1375, 1379 (10th Cir.1985), it is precisely the abuse of official power that 42 U.S.C. Sec. 1983 was designed to remedy. We conclude that official acts initiated and controlled by a district attorney cannot be characterized as random or unauthorized. Accordingly, Parratt and Hudson do not apply to Wolfenbarger's due process claim.
 
 
 49
 The judgment of the district court is reversed and the cause is remanded for proceedings consistent with this opinion.
 
 SETH, Circuit Judge, dissenting:
 
 50
 I must respectfully dissent from the majority position because I am not convinced that we should decide the due process issue on the basis of this summary judgment record, and as an issue not decided by the trial court. I would remand to the trial court.
 
 
 51
 If the due process issue is to be decided I would apply Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420, and Hudson v. Palmer, 468 U.S. ----, 104 S.Ct. 3194, 82 L.Ed.2d 393, and thus would depart from the majority opinion. I also no longer agree with the majority opinion in Lavicky v. Burnett, 758 F.2d 468 (10th Cir.), relied on by the majority opinion herein, although I was on the panel in that case, since I now see the error of my ways.
 
 
 52
 The Fourteenth Amendment due process clause is, of course, not intended to protect citizens from deprivations of property by individuals whether they be public employees or officials. The protection afforded is only against the state itself.
 
 
 53
 The problem which immediately arises in an examination of a deprivation of property incident, as in the case before us, is that it is difficult to keep the focus on the state itself in the "random" and "unauthorized" evaluations of pre-deprivation conduct as directed by the Supreme Court in Parratt v. Taylor and Hudson v. Palmer, and not to let the focus slip back to the point of view of the employees involved in the incidents. The individuals are the actors and the defendants and the first impulse is to evaluate especially the "random" element from their position.
 
 
 54
 The "random" and "unauthorized" conduct from the position of the state is demonstrated in Hudson in the intentional deprivation there concerned, but from the position of the employee it was there not random but intentional and planned. In the case before us the action of the officials from their point of view was not random but intended and planned. However, in looking at the acts from the position of the state itself, as we must, the acts were random, unexpected and unpredictable. They were such that predeprivation due process was "impracticable" as in Hudson. As the Court there said:
 
 
 55
 "Whether an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is solely whether the State is in a position to provide for predeprivation process."
 
 
 56
 The random elements of Hudson are thus present and we are not concerned with the alternative need for quick action.
 
 
 57
 The Court in Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265, was concerned with an act of a state agency in setting plaintiff's hearing date on a discharge claim beyond the time provided by state law. The state court held that, since it was beyond the statutory time, the agency conducting the hearing was without jurisdiction. The Supreme Court held the late setting was a direct action of the state agency in terminating plaintiff's right to a hearing. The operation of the state machinery itself was the fault. The court refers to "state procedure," and to the term in Parratt used in contrast to a random act by a state employee, but this is a narrow concept as the case includes only statutory dates and hearings. The Court so indicates in Logan after a reference to Parratt's mention of "established state procedure":
 
 
 58
 "Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference--whether the Commission's action is taken through negligence, maliciousness, or otherwise. Parratt was not designed to reach such a situation. See id., at 545 [101 S.Ct. at 1918] (second concurring opinion). Unlike the complainant in Parratt, Logan is challenging not the Commission's error, but the 'established state procedure' that destroys his entitlement without according him proper procedural safeguards."
 
 
 59
 In my view, when the focus is on the state the deprivation of the property was just as "random" here as it was in Hudson. As the Court said in Parratt:
 
 
 60
 "The loss of property, although attributable to the State as action under 'color of law,' is in almost all cases beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation. That does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities."
 
 
 61
 Even if the Logan decision is vastly expanded, we have here no "established state procedure" which was followed. Instead there is a letter from the District Attorney suggesting that items believed to be stolen found in pawnshops should be seized and taken to the police station. There is also a form signed by an Assistant District Attorney authorizing the delivery of the property so seized (and other property) to the person claiming ownership. The form was for the release of "evidence," but there was no case. There was no determination of the rights of plaintiff by a hearing or otherwise. No one was identified as the thief nor was anyone prosecuted for a theft of the items reported stolen. No action was filed. The identity of the person who pawned the property was also never established. The serial numbers on the property reported stolen by Mr. Loggens and on the pawned items matched.
 
 
 62
 Although in my view it is not significant, I cannot agree with the characterization of the District Attorney as a "policymaking state official." In Oklahoma there is no chief law enforcement officer among the county officials. The sheriff and the District Attorney are on a par as to this function and are to assist each other in the performance of law enforcement duties. The District Attorney has the duty to "prosecute all actions for crime committed in his district," and defend civil actions brought against the counties. The District Attorney is to give advice to county officials. He is elected on a district-wide basis. There appears to be no indication in the statutes that the District Attorney is to give advice to city and town police departments. But he or she is to prosecute violations of the state criminal laws which take place in his district. His policymaking seems to be limited to deciding whether to prosecute or not.
 
 
 63
 Thus, even if the District Attorney is a policymaker in directing the disposition of property contrary to state statutes, he is not the "state" for the purpose of the Fourteenth Amendment. He is at best a public employee directing action contrary to state law in a random way.
 
 
 64
 As indicated in the majority opinion, the trial court decided only the property interest issue, and found none to support the action. The proceedings were cut short and no other issues were considered. Under the admonitions of Parratt and Hudson the examination of the due process question, in my view, is not completed and cannot be completed on this record which at the most describes some pre-deprivation process.
 
 
 65
 I see no indication in the decisions on the particular issue before us nor in the basic Fourteenth Amendment opinions which would permit us to characterize these decisions by district or county officials as actions by the state itself within the Logan decision. The action of the Assistant District Attorney here concerned in directing the release of the property to Mr. Loggens without any determination as to the rights of the plaintiff should not be regarded as a statement of policy, if that is significant, nor be considered as "established state procedure" as the term is used in Parratt. The action instead was a random act by the official as far as the state is concerned and as far as the Fourteenth Amendment is concerned.
 
 
 66
 There are innumerable levels of policymaking in state and local government including that made in local police departments. As considered in this context all public employees are "policymakers" in some of their functions. It is difficult to see how this "policy" can become "established state procedure" without doing violence to the Fourteenth Amendment and to the Hudson and the Logan opinions.
 
 
 67
 The characterization of the acts of local employees as "policymaking" as a device to place the considerations of process into the pre-deprivation category only is not responsive to Hudson and Logan. It destroys the balance between state and federal courts in the determination of the basic issues.
 
 
 68
 I would remand the case to complete the due process evaluation by an examination of post-deprivation remedies.
 
 
 
 [1]
 The record indicates that the property was apparently stolen and pawned by an unknown third party. Although the Lawton police conducted an investigation, no one was ever identified or charged in the theft
 
 
 [2]
 A copy of this letter was also distributed to all pawnshop owners listed in the yellow pages of the Lawton telephone book
 
 
 [3]
 Section 1092 provides:
 "Every pawnbroker or person carrying on the business of a pawnbroker, and every junk dealer, who having received any goods which have been embezzled or stolen, refuses or omits to exhibit them, upon demand, during the usual business hours, to the owner of said goods or his agent authorized to demand an inspection thereof, or any peace officer, is guilty of a felony."
 
 
 [4]
 Sections 1321 and 1322 provide:
 "Sec. 1321. Stolen property to be held by officer.
 When property alleged to have been stolen or embezzled, comes into the custody of a peace officer, he must hold it subject to the order of the magistrate authorized by [section 1322] to direct the disposal thereof.
 "Sec. 1322. Stolen property--Magistrate to order delivery, when.
 On satisfactory proof of the title of the owner of the property, the magistrate before whom the information is laid, or who examines the charge against the person accused of stealing or embezzling the property, may order it to be delivered to the owner on his paying the reasonable and necessary expenses incurred in its preservation, to be certified by the magistrate. The order entitles the owner to demand and receive the property."
 
 
 [5]
 It is undisputed that the two stereo items were stolen from Logens or that he was the true owner
 
 
 [6]
 We are aware of no Oklahoma authority on the question whether a pawnbroker's interest in stolen property is one protected by the due process clause. The record contains an unpublished Oklahoma Court of Appeals decision purportedly addressing this question. Under Oklahoma law, however, unpublished Court of Appeals opinions are not considered binding and are not to be cited as precedent. See Okla.Stat. tit. 20 Sec. 30.5 (1981)
 
 
 [7]
 Due to its resolution of the property interest question, the district court did not reach this issue. Defendants offer it as an alternative ground on which to uphold the grant of summary judgment, and we therefore address this issue's merits on appeal. Some of the defendants also argue on appeal that they are protected by immunity. We believe this issue is best developed in the first instance in the trial court